# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

———————————————————

:
UNITED STATES OF AMERICA    :
:    Hon. Michael E. Farbiarz
    v.    :
:    Crim. No. 25-339
:
ROUZBEH "ROSS" HAGHIGHAT,    :
BEHROUZ "BRUCE" HAGHIGHAT,    :
KIRSTYN M. PEARL,    :
SEYEDFARBOD "FABIO" SABZEVARI,  :
JAMES D. ROBERGE    :

———————————————————

**United States' Response in Opposition to Defendant Behrouz "Bruce" Haghighat's Motion to Dismiss (ECF No. 79)**

LORINDA I. LARYEA
Acting Chief
Fraud Section, Criminal Division
U.S. Department of Justice

JOHN J. LIOLOS
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
John.Liolos@usdoj.gov
(202) 768-2246

# Table of Contents

Relevant Facts ..................................................................................................................................1

Legal Standards ..............................................................................................................................4

   I.   Standard of Review ................................................................................................................4

   II.  Substantive Law ...................................................................................................................5

Argument ........................................................................................................................................9

   I.   The Indictment's allegations are internally consistent. ........................................................9

   II.  The Indictment sufficiently alleges Ross Haghighat tipped Bruce Haghighat MNPI about the Company-1 Acquisition and Bruce Haghighat knowingly traded Company-1 securities on the basis of that MNPI. ...........................................................................................................13

   III.  The Indictment adequately alleges Bruce Haghighat acted willfully and satisfies the elements of the charged statutes. ......................................................................................................18

       A. Bruce Haghighat is properly charged with "trading" Company-1 stock. ..............................18

       B. The Indictment need not allege that Bruce Haghighat personally profited. ........................19

          1.  Section 1348 does not require financial gain to a defendant. ..................................19

          2.  Personal pecuniary profit is not required under Section 10(b). .................................22

       C. The Indictment adequately alleges Bruce Haghighat acted willfully in trading Company-1 securities on the basis of MNPI tipped by Ross Haghighat. ................................................25

Conclusion ....................................................................................................................................26

# Table of Authorities

*Blaszczak v. United States,*
   141 S. Ct. 1040 (Jan. 11, 2021) ........................................................................... 7

*Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,*
   769 F.2d 561 (9th Cir. 1985) ............................................................................ 10

*Costello v. United States,*
   350 U.S. 359 (1956) ......................................................................................... 4

*Dirks v. SEC,*
   463 U.S. 646 (1983) ................................................................................. *passim*

*Edgar v. Avaya, Inc.,*
   No. 05-cv-3598, 2006 WL 1084087 (Apr. 25, 2006) ........................................ 11

*Fifth Third Bancorp v. Dudenhoeffer,*
   573 U.S. 409 (2013) ......................................................................................... 11

*Graden v. Conexant Sys. Inc.,*
   574 F. Supp. 2d 456 (D.N.J. 2008) ................................................................... 11

*Jackson v. Va.,*
   443 U.S 307 (1979) .......................................................................................... 14

*Kousisis v. United States,*
   605 U.S. --, 145 S. Ct. 1382 ....................................................................... 19–20

*Kuehnert v. Textar Corp.,*
   412 F.2d 700 (5th Cir. 1969) ............................................................................ 23

*Lukon v. Pa. R.R. Co.,*
   131 F.2d 327 (3d Cir. 1942) ............................................................................. 14

*Mosser v. Darrow,*
   341 U.S. 267 (1951) .......................................................................................... 6

*Salman v. United States,*
   580 U.S. 39 (2016) ................................................................................... 6, 24–25

*Scott v. United States,*
   231 F. Supp. 360 (D.N.J. June 15, 1964) ....................................................... 4, 10

*SEC v. Adler,*
   137 F.3d 1325 (11th Cir. 1998) .......................................................................... 8

*SEC v. Alexander,*
   160 F. Supp. 2d 642 (S.D.N.Y. 2001) ................................................................. 8

*SEC v. Ballesteros Franco,*
   253 F. Supp. 2d 720 (S.D.N.Y. 2003) ............................................................... 11

*SEC v. Blackman,*
    No. 99-cv-72, 2000 WL 868770 (M.D. Tenn. May 26, 2000) ........................................... 8

*SEC v. Blackwell,*
    291 F. Supp. 2d 673 (S.D. Ohio 2003) ............................................... 11

*SEC v. Carroll,*
    No. 11–165, 2011 WL 5880875 (W.D. Ky. Nov. 23, 2011) ........................................ 8, 16–17, 26

*SEC v. Chester Holdings, Ltd.,*
    41 F. Supp. 2d 505 (D.N.J. 1999) ............................................... 14

*SEC v. Clay Cap. Mgmt., LLC,*
    No. 2:11-cv-05020, 2013 WL 5946989 (D.N.J. Nov. 6, 2013) ........................................... 6

*SEC v. Contorinis,*
    743 F.3d 296 (2d Cir. 2014) ............................................... 23

*SEC v. Ginsburg,*
    362 F.3d 1292 (11th Cir. 2004) ............................................... 8, 14, 26

*SEC v. Kornman,*
    391 F. Supp. 2d 477 (N.D. Tex. 2005) ............................................... 8

*SEC v. Lum's, Inc.,*
    365 F. Supp. 1046 (S.D.N.Y. 1973) ............................................... 14

*SEC v. Maio,*
    51 F.3d 623 (7th Cir. 1995) ............................................... 8

*SEC v. McGee,*
    895 F. Supp. 2d 669 (E.D. Pa. 2012) ...............................................*passim*

*SEC v. Michel,*
    521 F. Supp. 2d 795 (N.D. Ill. 2007) ............................................... 8

*SEC v. Moskowitz,*
    No. 97-cv-7174, 1998 WL 524903 (S.D.N.Y. Aug. 20, 1998) ............................................... 18–19

*SEC v. Musella,*
    578 F. Supp. 425 (S.D.N.Y. 1984) ............................................... 8

*SEC v. Musella,*
    748 F. Supp. 1028 (S.D.N.Y. Aug. 8, 1989) ............................................... 8, 10, 26

*SEC v. Obus,*
   693 F.3d 276 (2d Cir. 2012) ........................................................................ 22–23

*SEC v. Scoppetuolo,*
   No. 10–20475, 2011 WL 294443 (S.D. Fla. Jan. 27, 2011) .............................. 8

*SEC v. Shared Med. Sys. Corp.,*
   1994 WL 201858 (E.D. Pa. 1994) ...................................................................... 24

*SEC v. Steffes,*
   805 F. Supp. 2d 601 (N.D. Ill. 2011) ............................................................ 8, 26

*SEC v. Warde,*
   151 F.3d 42 (2d Cir. 1998) ....................................................... 8, 23–24, 26

*Sileo v. Superintendent Somerset SCI,*
   702 F. App'x 95 (3d Cir. 2017) .......................................................................... 14

*Tarasi v. Pittsburgh Nat'l Bank,*
   555 F.2d 1152 (3d Cir. 1977) ............................................................................. 23

*United States v. Advantage Med. Transp., Inc.,*
   751 F. App'x 258 (3d Cir. 2018) ........................................................... 4, 15, 26

*United States v. Bergrin,*
   650 F.3d 257 (3d Cir. 2011) ......................................................................... 5, 17

*United States v. Blaszczak,*
   56 F.4th 230 (2d Cir. 2022) ............................................................................ 6–7

*United States v. Blaszczak,*
   947 F.3d 19 (2d Cir. 2019) ....................................................................... 6–7, 25

*United States v. Bray,*
   853 F.3d 18 (1st Cir. 2017) ............................................................................... 14

*United Stats v. Cantrall,*
   612 F.2d 509 (10th Cir. 1980) .......................................................................... 13

*United States v. Chow,*
   993 F.3d 125 (2d Cir. 2021) ................................................................................. 6

*United States v. Coburn,*
   439 F. Supp. 3d 361 (D.N.J. 2020) ............................................................... 9, 13

*United States v. Conde,*
   309 F. Supp. 2d 510 (S.D.N.Y. 2003) ............................................................ 9, 13

*United States v. Coscia,*
   866 F.3d 782 (7th Cir. 2017) ............................................................................... 6

*United States v. Debrow,*
  346 U.S. 374 (1953) ................................................................................................ 4

*United States v. De La Pava,*
  268 F.3d 157 (2d Cir. 2001) .................................................................................. 4

*United States v. DeLaurentis,*
  230 F.3d 659 (3d Cir. 2000) .................................................................................. 5

*United States v. Diarra,*
  Nos. 22-3232, 23-1405, 2025 WL 1862994 (3d Cir. 2025) ............................. 17

*United States v. Frey,*
  42 F.3d 795 (3d Cir. 1994) ................................................................................... 21

*United States v. Frorup,*
  963 F.2d 41 (3d Cir. 1992) ............................................................................ 22, 25

*United States v. Gatto,*
  986 F.3d 104 (2d Cir. 2021) ................................................................................ 21

*United States v. Goldblatt,*
  813 F.2d 619 (3d Cir. 1987) ................................................................................ 19

*United States v. Greenlaw,*
  84 F.4th 325 (5th Cir. 2023) ............................................................................... 20

*United States v. Kemp,*
  500 F.3d 257 (3d Cir. 2007) ............................................................................ 5, 16

*United States v. Heron,*
  323 F. App'x 150 (3d Cir. 2009) ........................................................................... 8

*United States v. Hess,*
  124 U.S. 483 (1888) ............................................................................................. 15

*United States v. Mahaffy,*
  693 F.3d 113 (2d Cir. 2012) .................................................................................. 6

*United States v. Martoma,*
  894 F.3d 64 (2d Cir. 2017) ............................................................................ 24–25

*United States v. Mashinsky,*
  No. 23-cr-347, 2024 WL 4728500 (S.D.N.Y. Nov. 8, 2024) ....................... 9, 13

*United States v. Nai Fook,*
  206 F.3d 56 (1st Cir. 2001) ................................................................................... 4

*United States v. Obaygbona,*
  556 F. App'x 161 (3d Cir. 2014) ........................................................................... 9

v

*United States v. O'Hagan,*
    521 U.S. 642 (1997) ........................................................................................................ 7

*United States v. Palo,*
    No. 16-cr-23, 2017 WL 6594196 (W.D. Pa. Dec. 26, 2017) ........................................ 13

*United States v. Porat,*
    76 F.4th 213 (3d Cir. 2023) ................................................................................ *passim*

*United States v. Rajarantnam,*
    No. 13-cr-211, 2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014) ...................................... 12

*United States v. Rajaratnam,*
    802 F. Supp. 2d 491 (S.D.N.Y. 2011) ........................................................................ 26

*United States v. Ramsey,*
    565 F. Supp. 3d 641 (E.D. Pa. 2021) .......................................................................... 6

*United States v. Reily,*
    621 F.3d 312 (3d Cir. 2010) ...................................................................................... 19

*United States v. Resendiz-Ponce,*
    549 U.S. 102 (2007) .................................................................................................... 4

*United States v. Santos,*
    No. 18-cr-585, 2022 WL 1698171 (D.N.J. Mar. 22, 2022) ........................................ 19

*United States v. Schoenhut,*
    576 F.2d 1010 (3d Cir. 1978) ...................................................................................... 4

*United States v. Segal,*
    248 F. Supp. 2d 786 (N.D. Ill. 2003) ........................................................................ 4

*United States v. Vitillo,*
    490 F.3d 314 (3d Cir. 2007) ........................................................................................ 5

*United States v. Willis,*
    844 F.3d 155 (3d Cir. 2016) ........................................................................................ 4

## Rules and Statues

15 U.S.C. § 78j ................................................................................................ *passim*

18 U.S.C. § 2 .................................................................................................... *passim*

18 U.S.C. § 1348 .............................................................................................. *passim*

18 U.S.C. § 1349 ...................................................................................................... 9

Federal Rule of Criminal Procedure 7 .................................................................. 4, 15

Other

17 C.F.R. § 240.10b-5 .................................................................................................... 5, 7

Eleventh Cir. Pattern Crim. J. Instrs., O54 (Apr. 2024) ............................................9

Pattern Jury Instrs. Fed. Crim. Cases, D. South Carolina, (2024 ed.) .................... 6

Restatement (Third) of Trusts §§ 90, 91 (2007) ......................................................25

Third Cir. Model Crim. J. Instrs., "Wire Fraud," § 6.18.1343, Cmt. (Feb. 2021) .................................9

Third Cir. Model Crim. J. Instrs., "Direct and Circumstantial Evidence," § 3.03, Cmt. (Jan. 2018) .................................................................................................14

Third Cir. Model Crim. J. Instrs., "Mail or Wire Fraud – 'Intent to Defraud' Defined," § 6.18.1341–4, (Apr. 2024).................................................................................................20

The United States, through undersigned counsel, respectfully responds to Defendant Behrouz "Bruce" Haghighat's Motion to Dismiss (ECF No. 79). The Court should deny the Motion because the Indictment's consistent allegations adequately charge Bruce Haghighat with an insider trading scheme amounting to securities fraud and conspiracy under multiple federal statutes.

## Relevant Facts

The detailed 35-page Indictment in this case alleges an insider trading scheme in which Behrouz "Bruce" Haghighat, his brother, Rouzbeh "Ross" Haghighat, and three other co-Defendants "made illegal profits by trading in Company-1 securities based on material nonpublic information ('MNPI') regarding Company-2's acquisition of Company-1 (the 'Acquisition')." (Indict. para. 1 (ECF No. 10).)

The Indictment alleges relevant information about the Defendants, such as the fact that Ross Haghighat "was a Director on the Board of Directors of Company-1" and that "[i]n his position as a Director, Ross Haghighat obtained MNPI about Company-1's merger with Company-2." (*Id.* para. 2(a).) Regarding Bruce Haghighat, the Indictment alleges that he held a MBA degree, was the CEO of a company headquartered in or around Princeton, New Jersey, and was Ross Haghighat's brother. (*Id.* at 2(b).)

The Indictment includes a detailed "Acquisition Timeline," setting forth facts alleging significant MNPI Ross Haghighat possessed and the approximate dates on which he learned the MNPI as a Director on Company-1's Board. (*See id.* paras. 3–13.) For example, the Timeline alleges that around May 4, 2023, Company-2 made a proposal to acquire Company-1 for $32 per share in cash, and that Ross Haghighat learned of the proposal shortly thereafter. (*See id.* paras. 3–4.) As another example, the Indictment alleges that on or about May 22, 2023, Company-2 indicated it would increase its proposed all-cash purchase price to $36.00 per share, and that Ross Haghighat and the Company-1 Board and management discussed the proposal. (*Id.* para 8.) Later that day, Company-1's Board,

including Ross Haghighat, directed its financial advisor to respond to Company-2 that Company-1

would be willing to proceed at a price of $40.00 per share with contingent value rights that would pay

$4.00 per share on certain conditions. (*Id.* para. 8.) Further, on or about May 26, 2023, Company-2

informed Company-1 that Company-2 would be willing to move forward with a deal on those general

terms. (*Id.* para. 9.) Ross Haghighat and the Board discussed that offer the same day and determined

to proceed on an exclusive negotiating basis until on or about June 12, 2023. (*Id.*)

> Specifically as to Bruce Haghighat, the Indictment alleges that
>
>> Ross Haghighat, for personal benefit and with the expectation of
>> trading and in violation of his duties, provided MNPI to Bruce
>> Haghighat, who then traded Company-1 securities on the basis of that
>> MNPI. Bruce Haghighat purchased approximately 2,000 Company-1
>> shares prior to the Acquisition Announcement, which Bruce
>> Haghighat later sold for a profit of approximately $32,680.

(*Id.* para. 19.) The Indictment explains "Bruce Haghighat traded those shares in a brokerage account

at Broker-2 in the name of the 'Akma Irrevocable Trust,' a trust for which Brue Haghighat was the

trustee and Ross Haghighat was the grantor." (*Id.* para. 20.)

The section of the Indictment specifically pertaining to Bruce Haghighat sets out additional

detailed factual allegations supporting the statutory allegations of securities fraud and conspiracy. For

example, the Indictment alleges that, on or about May 26, 2023, after Ross Haghighat allegedly

possessed significant MNPI about the Acquisition, Bruce Haghighat and Ross Haghighat exchanged

several calls and texts, including a text where Bruce Haghighat asked, "What is the stick [sic] symbol?"

(*Id.* para. 24.) Ross Haghighat responded by WhatsApp message with Company-1's ticker symbol. (*Id.*)

Bruce Haghighat then explained: "[Advisor-1] called me and he needs 3 days to set up for options. I

am just going to buy it direct. If you changed your mind, let me know in the next hour." (*Id.*) That

same day, Bruce Haghighat had also told his financial advisor, Advisor-1, that "time is of the essence"

for a transaction he wanted to make, and later asked, "did you put the trade in . . . don't see it on the

account. I am trying to buy it today." (*Id.* paras. 23, 25.) Also that day, 2,000 shares of Company-1 stock were purchased in the Akma Trust account. (*Id.* paras. 25.)

The Indictment further alleges that, on or about June 12, 2023, the day of the Acquisition Announcement, Bruce Haghighat texted Ross Haghighat asking, "Let me know when u want to sell the stock." (*Id.* para. 27.) Ross Haghighat allegedly responded, "Oh right. Let's all it [sic] for $39 anytime[.]" (*Id.*) Shortly thereafter, Ross Haghighat allegedly texted Bruce Haghighat again, writing, "Bruce Ali, on second thought, hold onto it. The deal is $40+2+2 or $42/sh. The deal should close in August. Stock is at $38. Seems it has another 5-8% gain to go. So let's leave it alone. Thnx[.]" (*Id.*) That same day, Bruce Haghighat allegedly emailed the financial advisor for the Akma account that he wanted to sell all the Company-1 stock for $39 per share. (*Id* para. 28.) The following day, Bruce Haghighat wrote to the advisor again, asking to "hold off" on the sale and saying he would "contact [the advisor] in 2 weeks time" because he would "rather wait a little longer." (*Id.* para. 29.)

On or about July 7, 2023, Bruce Haghighat allegedly wrote to the advisor instructing him to sell all Company-1 shares for $39 per share, and the sale was accomplished that day "for an approximate profit of $32,680." (*Id.* para. 30.) On or about July 10, 2023, the advisor allegedly informed Bruce Haghighat that the transaction was completed and "in cash pending further instruction." (*Id.* para. 31.) That day, Bruce Haghighat allegedly texted Ross Haghighat: "The stuff sold. All in cash now. If u r not moving it, we should put it into a MM fun. Will pay about 4-5%. Balance is now 122k." (*Id.*) Allegedly about two weeks later, the $122,254 in the Akma Trust was wired to an account at a different broker in the name of the "R. Ross Haghighat Irrev. Trust," for which Bruce Haghighat was the trustee. (*Id.* para. 32.)

## Legal Standards

### I.    Standard of Review

"An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for a trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). "The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (quoting *United States v. Nai Fook Li*, 206 F.3d 56, 61 (1st Cir. 2000) (en banc)). "[A]n indictment should be upheld 'unless it is so defective that it does not, by any reasonable construction, charge an offense.'" *United States v. Advantage Med. Transp., Inc.*, 751 F. App'x 258, 262 (3d Cir. 2018) (quoting *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016)).

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The Federal Rules "were designed to eliminate technicalities in criminal pleadings and are to be construed to secure simplicity in procedure." *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (quoting *United States v. Debrow*, 346 U.S. 374, 376 (1953) (internal citations omitted)). "In determining the sufficiency of an indictment, practical rather than technical considerations are observed by the Court . . . ." *Scott v. United States*, 231 F. Supp. 360, 363 (D.N.J. June 15, 1964); *see also United States v. Schoenhut*, 576 F.2d 1010, 1022 (3d Cir. 1978) ("The indictment need not be read technically, but should be construed with an appreciation of the existing realities."); *United States v. Segal*, 248 F. Supp. 2d 786, 789–90 (N.D. Ill. 2003) ("In construing the indictment, the Court infers facts necessarily implied and employs common sense." (cleaned up)).

An indictment is sufficient if it: "(i) contains the elements of the offense intended to be charged; (ii) sufficiently apprises the defendant of what he must be prepared to meet; and (iii) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in

the event of a subsequent prosecution." *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007) (quotations and citation omitted). "[N]o greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *Id.* (quotations and citations omitted).

In considering a motion to dismiss an indictment, a district court's review is limited. The court must accept all factual allegations in the indictment as true. *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011). A motion to dismiss is "not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000). "[A] challenge to the sufficiency of the indictment should be decided based on the facts alleged within the four corners of the indictment, not the evidence outside of it." *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). "Evidentiary questions—such as credibility determinations and the weighing of proof— should not be determined at this stage." *Bergrin*, 650 F.3d at 265 (quotations and citation omitted).

## II.    Substantive Law

The Indictment's allegations against Bruce Haghighat charge an insider trading scheme under two securities fraud statutes and a conspiracy statute under a tipper-tippee theory of insider trading. A court in this district has explained the tipper-tippee theory:

> The United States Supreme Court's insider trading jurisprudence is not limited to insiders or misappropriators who trade for their own account. Section 10(b) and Rule 10b-5 also apply to situations in which the insider or misappropriator tips another who trades on the information. In *Dirks* [*v. SEC*], the United States Supreme Court held that a tipper violates Section 10(b) by disclosing material nonpublic information to his tippee, in breach of his duty to keep the information confidential. In determining the scope of tipper-tippee liability under Section 10(b), the Supreme Court expressed that "the test is whether the insider personally will benefit, directly or indirectly, from his disclosure." In regards to the insider's "personal benefits," the Supreme Court ruled that, as with someone in [defendant's] position, "elements of fiduciary duty and exploitation of nonpublic information

also exist when an insider makes a gift of confidential information to a trading relative or friend." *Id.* at 664.

*SEC v. Clay Cap. Mgmt., LLC*, No. 2:11-cv-05020, 2013 WL 5946989, at *3 (D.N.J. Nov. 6, 2013) (quoting *Dirks v. SEC*, 463 U.S. 646, 662–63 (1983)); *see also Salman v. United States*, 580 U.S. 39, 48–49 (2016) (holding tipper personally benefitted sufficient for insider trading liability by making gift of MNPI to his brother).

"A tippee's liability is derivative of the tipper's." *SEC v. McGee*, 895 F. Supp. 2d 669, 683 (E.D. Pa. 2012). As the Supreme Court explained in *Dirks*, "the transactions of those who knowingly participate with the [insider] in such a breach are 'as forbidden' as transactions 'on behalf of the trustee himself. . . . [A] contrary rule 'would open up opportunities for devious dealings in the name of the others that the trustee could not conduct in his own.'" 463 U.S. at 659 (quoting *Mosser v. Darrow*, 341 U.S. 267, 271–72 (1951)) (citation omitted).

Accordingly, Count 1 charges Bruce Haghighat and his co-Defendants with an insider trading scheme in violation of 18 U.S.C. §§ 1348 & 2. The elements of Section 1348 are:

1.  The Defendant(s) executed or attempted to execute a scheme to defraud (Section 1348(1)), or to obtain any money or property by means of material false or fraudulent pretenses, representations, or promises (Section 1348(2));

2.  The Defendant(s) did so knowingly and with the intent to defraud; and

3.  The scheme was in connection with a security.

*See, e.g.*, 18 U.S.C. § 1348; *United States v. Coscia*, 866 F.3d 782, 797 (7th Cir. 2017); *United States v. Mahaffy*, 693 F.3d 113, 125 (2d Cir. 2012); *United States v. Ramsey*, 565 F. Supp. 3d 641, 643 (E.D. Pa. 2021); *see also* Pattern J. Instrs. for Fed. Crim. Cases, D. South Carolina, p. 276 (2024 ed.).[1]

---

[1] As the Defendant recognizes (Mot. at 20), tipper–tippee insider trading cases charged under Section 1348 generally follow the same principles as those under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)). *See, e.g.*, *United States v. Chow*, 993 F.3d 125, 136–43 (2d Cir. 2021) (affirming insider trading convictions under both statutes). At least one court has found, however, that Section 1348 does not require a personal benefit to the tipper as required under Section 10(b). *See United States v. Blaszczak*, 947 F.3d 19, 45 (2d

Count 3 charges Bruce Haghighat and Ross Haghighat with an execution of that insider trading scheme under 15 U.S.C. § 78j(b),[2] 17 C.F.R. § 240.10b-5,[3] and 18 U.S.C. § 2. As a district court in this circuit explained:

> To state a claim for tippee liability under § 10(b) and Rule 10b-5, the complaint must allege sufficient facts that, if proven, would establish that: (1) [tipper] misappropriated material, nonpublic information; (2) he breached [a] duty of trust or confidence; (3) [tipper] shared the information with [tippee]; . . . [(4) tippee] traded on the information; and ([5]) [tippee] knew or should have known that the information had been misappropriated from an insider.

*SEC v. McGee*, 895 F. Supp. 2d 669, 682 (E.D. Pa. 2012).

Whether the tippee knew of the tipper's breach of duty is often established circumstantially. As the *McGee* court explained, "[i]n the insider trading context, scienter may be inferred from circumstantial evidence because the specific facts are peculiarly within the knowledge of the

---

Cir. 2019) (ruling the personal benefit test does not apply to Section 1348 insider trading charges) ("*Blaszczak I*"), *vacated on other grounds by Blaszczak v. United States*, 141 S. Ct. 1040 (Jan. 11, 2021); *but see United States v. Blaszczak*, 56 F.4th 230, 246–47 (2d Cir. 2022) (Walker, J., concurring) (disagreeing with "personal benefit" holding of *Blaszczak I*).

[2] Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b) provides:

> It shall be unlawful . . . (b) To use or employ, in connection with . . . any security, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[3] Rule 10b-5, promulgated under Section 10(b) and codified at 17 C.F.R. § 240.10b-5, provides:

> It shall be unlawful . . . , (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Courts have long recognized that Section 10(b) and Rule 10b-5 prohibit insider trading. *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 650–51 (1997).

defendants. Circumstantial evidence probative of scienter includes the sophistication of the tippee,[4] the temporal proximity of communications between the tippee and the insider or alleged misappropriator and the tippee's trades,[5] and trades atypical to the tippees investment patterns.[6]" *McGee*, 895 F. Supp. 2d at 683–84 (internal quotations and citations omitted); *see also United States v. Heron*, 323 F. App'x 150, 156 (3d Cir. 2009) (reversing district court's ruling jury could not have found defendant traded on basis of MNPI where a reasonable jury could have found the defendant possessed MNPI even though government only introduced circumstantial evidence).

Both Counts 1 and 3 include liability under 18 U.S.C. § 2, which has two prongs:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

---

[4] *See SEC v. Carroll*, No. 11–165, 2011 WL 5880875, at *8 (W.D. Ky. Nov. 23, 2011) ("A tippee's sophistication supports an inference of knowledge that information was obtained in violation of the tipper's fiduciary duty." (citations omitted)); *see also SEC v. Michel*, 521 F. Supp. 2d 795, 828 (N.D. Ill. 2007); *SEC v. Blackman*, No. 99-cv-72, 2000 WL 868770, at *8 (M.D. Tenn. May 26, 2000; *SEC v. Musella*, 578 F. Supp. 425, 442 (S.D.N.Y. 1984).

[5] *See SEC v. Ginsburg*, 362 F.3d 1292, 1299 (11th Cir. 2004) ("The temporal proximity of a phone conversation between the trader and one with insider knowledge provides a reasonable basis for inferring that the basis of the trader's belief was the inside information. The larger and more profitable the trades, and the closer in time the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information"); *SEC v. Maio*, 51 F.3d 623, 633 (7th Cir. 1995) (finding there was sufficient evidence that the tippee acted with scienter where he knew the insider's position in the corporation and bought the stock in question shortly after speaking with the insider); *SEC v. Steffes*, 805 F. Supp. 2d 601, 618 (N.D. Ill. 2011) (holding "suspicious timing" of phone conversations between the insider and the defendant supported an inference of scienter) (citing *SEC v. Alexander*, 160 F. Supp. 2d 642, 652–53 (S.D.N.Y. 2001)); *SEC v. Warde*, 151 F.3d 42, 47–48 (2d Cir. 1998) (finding trading on the basis of MNPI where tipper was a director at company and tippee traded in accounts in the name of other entities); *SEC v. Scoppetoulo*, No. 10–20475, 2011 WL 294443, at *3 (S.D. Fla. Jan. 27, 2011) ("Suspicious timing of communications and trading support an inference of bad faith and scienter."); *SEC v. Kornman*, 391 F. Supp. 2d 477, 493 (N.D. Tex. 2005) ("The SEC's allegations regarding the extremely opportunistic timing of Kornman's purchases immediately after learning the confidential information . . . support an inference that he had adequate scienter and provide strong circumstantial evidence of conscious behavior.").

[6] *See SEC v. Adler*, 137 F.3d 1325, 1340–41 (11th Cir. 1998) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter."); *Michel*, 521 F. Supp. 2d at 828–29; *Musella*, 748 F. Supp. at 1039.

> (b) Whoever willfully causes an act to be done which if directly performed
> by him or about would be an offense against the United States, is
> punishable as a principal.

18 U.S.C. § 2.

Finally, Count 18 charges Bruce Haghighat and Ross Haghighat with a conspiracy to commit securities fraud in violation of 18 U.S.C. § 1349. As alleged here, the statute requires that (1) two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit securities fraud, as charged in the indictment; and (2) the Defendant knew the unlawful purpose of the plan and willfully joined in it. *See, e.g.*, *United States v. Obaygbona*, 556 F. App'x 161, 163–64 (3d Cir. 2014); Eleventh Cir. Pattern J. Instrs., O54 (Apr. 2024); *see also* Third Cir. Model Crim. J. Instrs., "Wire Fraud," § 6.18.1343, Cmt. (Feb. 2021).

## Argument

### I.    The Indictment's allegations are internally consistent.

An indictment is defective or repugnant if it contains logically inconsistent counts. *United States v. Mashinsky*, No. 23-cr-347, 2024 WL 4728500, at *3–4 (S.D.N.Y. Nov. 8, 2024) (rejecting repugnance argument where single set of internally consistent facts supported charges for both securities fraud and commodities fraud). When courts are confronted with such arguments, "[e]xamples of dismissal, or even forced election, are rare . . . . [T]hey involve stark contradictions, generally, factual in nature—allegations that an event both did and did not occur, or that two different people committed a one-person act." *United States v. Coburn*, 439 F. Supp. 3d 361, 381 (D.N.J. 2020) (denying defendant's motion and finding no repugnance). Thus, in order to be repugnant (or inconsistent), allegations in one count must negate allegations in another count. *United States v. Conde*, 309 F. Supp. 2d 510, 511 (S.D.N.Y. 2003) (finding repugnance where same act—defendant accepting payment from confidential informant for fake identification—was both act in furtherance of conspiracy charge and basis for theft charge).

That is not so here. This Indictment alleges the same exact internally consistent facts as the basis of the three separate counts charging Bruce Haghighat and Ross Haghighat together. Specifically, the Indictment alleges that: Ross Haghighat tipped Bruce Haghighat MNPI with the expectation of trading, Bruce Haghighat knowingly directed the advisor of the Akma Trust to purchase Company-1 shares on the basis of that MNPI, and Bruce Haghighat later directed the advisor to sell those shares "for profit" accruing to the benefit of trusts in which Bruce Haghighat was the trustee and Ross Haghighat was the grantor. (Indict. paras. 19–32.) The Indictment does not allege that "profit" was personal profit for Bruce Haghighat himself to keep forevermore, but also simultaneously profit in a trust. The only place that "profit" is described as personal to Bruce Haghighat is in Bruce Haghighat's brief. (*Compare* Indict. *with* Mot. at 19.) Rather, the Indictment explains that the profit was the trust's: on or about July 24, 2023, the profit along with other funds were wired to an account at a different broker "in the name of the 'R. Ross Haghighat Irrev. Trust,' for which Bruce Haghighat was the trustee . . . ." (Indict. para. 32.)

Instead of taking the Indictment's allegations as true, as required, the Defendant picks and chooses: where it helps his argument, he reads the Indictment with flexibility beyond the bounds of its meaning; where it hurts his arguments, he reads the Indictment by cherry-picking around its express context. The law supports neither approach. *See, e.g.*, *Scott*, 231 F. Supp. at 363 ("[P]ractical rather than technical considerations are observed by the Court . . . .").

Premised on such flawed readings, the Defendant makes two arguments asserting the Indictment's allegations regarding profit are internally inconsistent and thus repugnant: that the Defendant "(1) did not execute any trades himself and (2) did not make any profit." (Mot. at 10.) The first argument—that he did not execute any trades himself—flies squarely in the face of hornbook agency law. *See, e.g.*, *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561, 567 (9th Cir. 1985) ("A stockbroker is an agent of his client."); *SEC v. Musella*, 748 F. Supp. 1028, 1032–

10

33 (S.D.N.Y. Aug. 8, 1989) (defendants liable for insider trading where trades placed through third-party brokers). The Indictment is replete with allegations that Bruce Haghighat instructed Advisor-1 to execute the trades in question in the Akma Trust, for which Bruce Haghighat was trustee. (Indict. paras. 20–25, 28–31.) The Indictment even alleges Bruce Haghighat told Ross Haghighat, "*I* am just going to buy it direct" and told Advisor-1, "*I* am trying to buy it today." (Indict. paras. 24–25 (emphasis added).) Thus, the Indictment adequately alleges Bruce Haghighat executed the trades in Company-1 securities sufficient for legal liability and without internal inconsistency.

To the extent the Defendant's argument rests not on agency, but on his role as trustee, it is simply not the law that a trustee can insider trade for the benefit of a trust without incurring legal liability. *See, e.g.*, *Edgar v. Avaya, Inc.*, No. 05-cv-3598, 2006 WL 1084087, at *10 (Apr. 25, 2006) ("Not even a fiduciary acting in its fiduciary capacity is permitted to engage in insider trading." (cleaned up)); *see also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 423 (2013) ("Surely a fiduciary is not obligated to break the insider trading laws even if his company is about to fail."); *Graden v. Conexant Sys. Inc.*, 574 F. Supp. 2d 456, 465 (D.N.J. 2008) ("[N]o such duty [to avoid losses based non-disclosed adverse information] can be imposed on fiduciaries because divesting the Plan of employer stock before the earnings announcement, that is, based on non-public information, would have exposed the fiduciaries to liability for insider trading."); *SEC v. Blackwell*, 291 F. Supp. 2d 673, 680–84 (S.D. Ohio 2003) (denying defendants' motions to dismiss insider trading charges where tippee defendant purchased shares in trust and profits accrued in trust); *SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 728 (S.D.N.Y. 2003) (denying motion to dismiss where tippee traded in trust). Were that the law, insider trading would be legal and "insider trading trusts" would abound.

The Defendant's second argument—that he did not personally profit—is similarly unavailing, because (1) the Indictment does not allege that he did personally profit, and (2) to the extent this is related to his sufficiency arguments, the charged counts do not require personal pecuniary profit as an

element of the offenses, as discussed further below. *See infra* pp. 19–25; *see also United States v. Porat*, 76 F.4th 213, 222 (3d Cir. 2023) (rejecting defendant's "contention that wire fraud requires proof that the defendant sought to personally obtain money or property"). Accordingly, the Indictment is internally consistent, alleging that Bruce Haghighat sold the shares in the Akma Trust "for an approximate profit of $32,680." (Indict. para. 30.)

This is entirely unlike the situation in *United States v. Rajarantnam*, where three different counts in the indictment alleged two different people "caused" the same entity to buy the same shares of stock. *See United States v. Rajarantnam*, No. 13-cr-211, 2014 WL 1554078, at *6–7 (S.D.N.Y. Apr. 17, 2015). There, count one alleged that one person "caused" an entity to buy shares of stock, and counts four and seven alleged a different person (the defendant) "caused" the same entity to buy the same shares of stock. *See id.* The court found these allegations internally inconsistent, because different counts could not logically allege different people "caused" the same specific acts that formed the basis for the three separate counts. *See id.* The scenario equivalent in this case would be alleging in one count that Bruce Haghighat "caused" 2,000 shares of Company-1 stock to be bought in the Akma Trust on May 26, and alleging in a different count that Ross Haghighat "caused" the same 2,000 shares of Company-1 stock to be bought in the Akma Trust on May 26. The Indictment does not allege that.

Here, in contrast, the three Counts at issue all charge both Bruce Haghighat and Ross Haghighat and rely on the same consistent underlying factual allegations: that Ross Haghighat tipped Bruce Haghighat MNPI with the expectation of trading, Bruce Haghighat knowingly directed the broker to purchase Company-1 shares on the basis of that MNPI, and Bruce Haghighat later directed the advisor to sell those shares for profit accruing to the benefit of a trust in which Bruce Haghighat

was the trustee and Ross Haghighat was the grantor.[7] (Indict. paras. 19–32.) These allegations are internally consistent.

In short, there is no claim that Bruce Haghighat monetarily profited in his personal capacity. Nor need there be. *See infra* pp. 19–25. Accordingly, this is not the "rare" example of repugnance but instead a straightforward tipper-tippee allegation of insider trading, and the Court should deny the Motion. *See, e.g.*, *Coburn*, 439 F. Supp. 3d at 381; *see also Mashinsky*, 2024 WL 4728500, at *3–4.

## II.    The Indictment sufficiently alleges Ross Haghighat tipped Bruce Haghighat MNPI about the Company-1 Acquisition and Bruce Haghighat knowingly traded Company-1 securities on the basis of that MNPI.

The Defendant's second argument asserts that the Indictment's allegations are insufficient because they neither (1) assert the precise, specific MNPI Ross Haghighat told Bruce Haghighat nor (2) allege that Bruce Haghighat knew MNPI was disclosed in violation of Ross Haghighat's fiduciary duties. The Defendant is incorrect on the law and the facts.

As to the law, the Defendant paradoxically sets a higher bar for allegations in an indictment than courts have required for proven facts necessary for trial convictions in insider trading cases. The Defendant's arguments are premised on the erroneous and unsupported notion that "the Indictment must plead facts showing that Ross *in fact* tipped Bruce MNPI and that Bruce *in fact* acted upon that MNPI to execute trades in Company-1 stock." (Mot. at 16 (emphasis added).) Those premises are fundamental to the Defendant's arguments. But those premises are wrong.

---

[7] The other cases the Defendant cites are similarly inapposite here. *See United Stats v. Cantrall*, 612 F.2d 509, 510–11 (10th Cir. 1980) (finding inconsistency where convictions for "transporting" two loads of firearms from Missouri to Kansas and "receiving" the same fire arms in Kansas on the same day were irreconcilable charges based on the same specific acts); *United States v. Conde*, 309 F. Supp. 2d 510, 511–12 (S.D.N.Y. 2003) (finding allegations internally inconsistent where same single payment alleged as voluntary act in furtherance of conspiracy and also as theft); *United States v. Palo*, No. 16-cr-23, 2017 WL 6594196, at *5–7 (W.D. Pa. Dec. 26, 2017) (finding repugnance where count one charged a health care fraud scheme predicated on the performance of dental services that were not medically necessary, and counts two through twenty-seven were predicated on the same scheme but predicated on billing for services that had not been performed).

For example, merely passing a ticker symbol with a "wink and a nod" can suffice as a tip of MNPI. *See, e.g.*, *United States v. Bray*, 853 F.3d 18, 22–23 (1st Cir. 2017) (finding an actionable tip where the insider merely wrote the name of a company on a napkin and passed napkin to tippee saying it "could be a good one"); *SEC v. Lum's, Inc.*, 365 F. Supp. 1046, 1059 (S.D.N.Y. 1973) (finding the bare recommendation to buy the company an actionable tip where source had a unique relationship to issuer). Further, the timing and nature of attempted trading can be strong circumstantial evidence of a tip, as they are here. *See, e.g.*, *SEC v. Ginsburg*, 362 F.3d 1292, 1297–01 (11th Cir. 2004) (". . . [T]he closer in time the trader's exposure to the insider, the stronger the inference that the trader was acting on the basis of inside information."); *McGee*, 895 F. Supp. 2d at 683–84; *SEC v. Chester Holdings, Ltd.*, 41 F. Supp. 2d 505, 525 (D.N.J. 1999) ("Insider trading . . . at suspicious times is probative of bad faith and scienter." (quotations and citation omitted)); *supra* at 6 nn. 2–4.

"The fact that evidence is circumstantial does not mean that it has less probative value than direct evidence." Third Cir. Model Crim. J. Instrs., "Direct and Circumstantial Evidence," § 3.03, Cmt., (Jan. 2018) (citing *Jackson v. Va.*, 443 U.S. 307, 319 (1979); *Sileo v. Superintendent Somerset SCI*, 720 F. App'x 95 (3d Cir. 2017) (non-precedential); *Lukon v. Pa. R.R. Co.*, 131 F.2d 327 (3d Cir. 1942)). Thus, the Defendant's arguments are a quintessential straw man: misstating the law as requiring more than it does and knocking down the straw man for failing to meet the wrong standard. The Court should reject these efforts.

As to the facts, the Indictment is replete with allegations, both direct and circumstantial, that sufficiently allege the charges here. For starters, the Indictment alleges that "Ross Haghighat, for personal benefit with the expectation of trading and in violation of his duties, provided MNPI to Bruce Haghighat, who then traded Company-1 securities on the basis of that MNPI." (Indict. para. 19.) Those allegations are buttressed by the statutory allegations, supplying the elements of the offenses. (*Id.* paras. 81, 83, 85). Beyond that, the Indictment supplies copious particulars.

What Bruce Haghighat allegedly said speaks volumes. For example, shortly after hanging up with Ross Haghighat on May 26—the very day Company-1 and Company-2 agreed on general terms of a deal—Bruce Haghighat texts Ross Haghighat asking, "what is the stick [sic] symbol?" (*Id.* paras. 9, 24.) Without any more detail and notwithstanding the typo, Ross Haghighat understands, switches from standard text messaging to encrypted WhatsApp, and sends the Company-1 ticker. (*Id.*) In response, Bruce Haghighat explains the account is not set up for options so he is "just going to buy it direct," and says "[i]f you changed your mind, let me know in the next hour." (*Id.* para. 24.) Ross Haghighat does not respond and the shares are purchased. (*Id.* para. 24–25.) Just those allegations supply circumstantial evidence and support numerous permissible inferences[8] including that their conversation in the phone call only several minutes prior concerned, at the very least, Company-1 and a plan to purchase Company-1 stock while Ross Haghighat was in possession of MNPI regarding the proposed merger. The fact that they were initially attempting to conduct that trading through options, which were apparently not already set up in the account, provides additional facts from which to infer illicit trading on the basis of MNPI. (Indict. paras. 21–22.)

Similar circumstantial evidence and inferences abound throughout the Indictment's allegations. For example, Bruce Haghighat made numerous statements to his broker, Advisor-1, suggesting Ross Haghighat told him of the recent advancements in the merger negotiations and that Bruce Haghighat urgently wanted to accomplish the transaction in Company-1 securities in time to benefit from those advancements. That included Bruce Haghighat telling his Advisor-1:

- "I have a short window of opportunity for a transaction." (Indict. para. 21.)

---

[8] The Defendant's repeated citation of dicta from 1888 (Mot. at 16, 18), before Rule 7 or Section 10(b) existed, do not constrain this Court from reading the Indictment practically and acknowledging permissible inferences from the facts alleged. *See, e.g., Advantage Med. Transp., Inc.,* 751 F. App'x at 262. Further, in that case, *United States v. Hess,* the indictment supplied only statutory language, "without averments disclosing the particulars of the alleged offense." 124 U.S. 483, 487 (1888). Not so here.

- "Pls add this option [to trade options] to this account ASAP. I will have a transaction for you as early as Friday, or next Tuesday. Pls let me know when this feature has been added." (*Id.* para. 22.)

- "Well time is of the essence." (*Id.* para. 23.)

- "I am just going to buy it direct. If you changed your mind, let me know in the next hour." (*Id.* para. 24.)

- "did you put the trade in . . . don't see it on the account. I am trying to buy it today." (*Id.* para. 25.)

Such allegations are more than sufficient to meet the applicable notice pleading standard; much more than mere notice is provided here. *See, e.g.*, *Kemp*, 500 F.3d at 280. Even engaging with the allegations beyond accepting them, as the Defendant does and the Court should not, it strains credulity to suggest that Bruce Haghighat would express urgency in all of these ways without knowing why, in fact, it was urgent to purchase Company-1 shares—that significant merger offers were exchanged and "time is of the essence." (*See id.* para. 23.) It similarly strains credulity to suggest that Bruce Haghighat—alleged to be a sophisticated businessman with a MBA degree who is the CEO of his own company—would (i) not know his own brother's role on the Board of Company-1 while discussing Company-1 securities in detail, (ii) not even ask his own brother why "time is of the essence" and why they would want to trade options if he did not know either of these answers, and (iii) not know information like significant acquisition offers was material non-public information. *See, e.g.*, *SEC v. Carroll*, No. 11–165, 2011 WL 5880875, at *8 (W.D. Ky. Nov. 23, 2011) ("A tippee's sophistication supports an inference of knowledge that information was obtained in violation of the tipper's fiduciary duty."). Every fact need not be expressly alleged to meet the notice pleading standard, as this Indictment does. *See, e.g.*, *Kemp*, 500 F.3d at 280.

What Bruce Haghighat allegedly did not say in certain instances also speaks volumes. For example, on the very day of the Acquisition Announcement, Bruce Haghighat's text to Ross Haghighat was, "let me know when u want to sell stock." (Indict. para. 27.) He did not say anything about the

Acquisition. If one did not know in advance about the Acquisition that happened that very day and caused tremendous appreciation in the stock they *just* bought, the natural first message would be to mention the Acquisition and express surprise that the trade they had just conducted was so timely and beneficial. No such statement is alleged. Indeed, Bruce Haghighat did not even need to identify the "stock" at issue for Ross Haghighat to apparently understand what Bruce Haghighat was referencing, as Ross Haghighat immediately started rattling off detailed deal terms. (*Id.*) Bruce Haghighat did not respond to the deal details with, "what are you talking about?," as one who had no prior knowledge of either the Acquisition (announced just that day) or its minutia naturally might. (*See id.*) These and other inferences are permissible from the facts alleged and satisfy the elements of the charges at issue.[9]

Attempting to distance himself from these significant allegations, the Defendant (1) reads out allegations of the Indictment that must be accepted as true (*e.g.*, Mot. at 17), (2) improperly weighs the facts alleged (*e.g.*, Mot. at 18–19), (3) fails to acknowledge permissible inferences from the allegations (*e.g.*, Mot. at 16–19), and (4) generally reads the Indictment in a constrained rather than flexible manner—none of which the Court should do.[10] *See, e.g.*, *Bergrin*, 650 F.3d at 265. Accepted as true as they must be, the allegations of the Indictment along with the statutory language specifically alleging the elements of the offense are sufficient to allege that Bruce Haghighat knowingly conducted the alleged trading in Company-1 on the basis of MNPI provided by Ross Haghighat. *See id.* Whether that is so is a question for the jury.

---

[9] The Defendant half-heartedly suggests, in a footnote, that the Court should also dismiss the conspiracy charge in Count 18. (*See* Mot. at 14.) But a conspiracy is alleged and "[c]onspiracies can be shown from entirely circumstantial evidence." *United States v. Diarra*, Nos. 22-3232, 23-1405, 2025 WL 1862994, at *5 (3d Cir. 2025). Accordingly, the Court should reject the Defendant's request.

[10] Nor does the Defendant even meaningfully address the conspiracy charge or liability under 18 U.S.C. § 2.

III.    **The Indictment adequately alleges Bruce Haghighat acted willfully and satisfies the elements of the charged statutes.**

The Indictment's allegations, including those detailed above, also sufficiently allege that Bruce Haghighat acted willfully in his illegal trading, and satisfy the elements of the charged offenses. The Defendant makes a series of arguments attempting to insulate himself from liability, claiming the Indictment does not allege that he "traded," "profited," or acted "willfully."[11] None of these arguments are availing.

**A.  Bruce Haghighat is properly charged with "trading" Company-1 stock.**

First, Bruce Haghighat again argues that he did not "trade" the Company-1 stock at issue. The Defendant's constrained reading does not accord with the law or alleged facts.

To the extent the Defendant's argument is that he did not "trade" because he directed Advisor-1 to do so, that is in direct conflict with hornbook agency law, described above. *See supra* pp. 10–11. Further, the Indictment alleges Bruce Haghighat said, "I am just going to buy it direct." (Indict. para. 24.) That must be accepted as true. Accordingly, the Court should reject the argument.

To the extent the Defendant's argument is that he did not "trade" because he was acting in his role as trustee that, too, must be rejected, as detailed above.[12] *See supra* p. 11. To the extent this argument rests entirely on the willfulness of his trading, that is addressed further below. *See infra* pp. 25–26.

At best, Bruce Haghighat's arguments amount to a selective prosecution defense—that because Bruce Haghighat conducted the at-issue trading in the Akma Trust, the United States also should have charged the Akma Trust with criminal liability as well. *See, e.g., SEC v. Moskowitz*, No. 97-

---

[11] The United States found the organization of the Defendant's brief slightly conflated and attempts to structure the response analytically, although distinct from the Defendant's presentation.

[12] Defendant Ross Haghighat appears to recognize this principal because he is charged in Count 2 with trading in an account held in custody for his minor daughter and he does not raise such an argument.

cv-7174, 1998 WL 524903, at *4 (S.D.N.Y. Aug. 20, 1998) (denying motion to dismiss and finding trust could be independently liable for securities fraud for illegal activity of trustee perpetrated through trust funds). But it is established law that the potential guilt of a third party is not a defense to a particular defendant's guilt. *E.g.*, *United States v. Santos*, No. 18-cr-585, 2022 WL 1698171, at *4 (D.N.J. Mar. 22, 2022) (excluding evidence of lender misconduct in bank fraud case because other's misconduct not a defense to fraud). Accordingly, the Court should reject the Defendant's attempted sleight of hand and deny his Motion.

**B. The Indictment need not allege that Bruce Haghighat personally profited.**

The Defendant's personal profit is not required under any of the charged statutes. The Third Circuit has expressly rejected such an argument under the fraud statutes. *See United States v. Porat*, 76 F.4th 213, 215 (2023). The elements of the two securities fraud statutes differ slightly, so the United States takes them in turn, but none of them require personal profit. In short, the Court should reject the Defendant's arguments because Bruce Haghighat's personal profit is not required.

**1. Section 1348 does not require financial gain to a defendant.**

Defendant's contention that, "to obtain a conviction on a § 1348 charge, financial gain to the defendant must be shown," is simply wrong on the law and in conflict with both the text of the statute and Third Circuit precedent to the contrary. (*See* Mot. at 21.)

First, the two elements of the statute at issue—the property and intent elements—do not require personal profit or a gain to a defendant. *See* 18 U.S.C. § 1348; *United States v. Reily*, 621 F.3d 312, 332 (3d Cir. 2010) ("To support a fraud conviction it is 'not necessary for the Government to demonstrate that [the defendant] personally benefitted from [the] scheme.'" (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987)).

The property element of the statute requires only that the scheme be one devised to defraud or obtain property, *i.e.*, the shares of Company-1 stock. *See id.*; *Kousisis v. United States*, 605 U.S. --, 145

S. Ct. 1382, 1397 (2025) ("[A] defendant commits wire fraud only if his scheme 'aimed to deprive' the victim of a traditional property interest.").[13] Under Section 1348, a scheme may either (i) "defraud" another, meaning "deprive" the victim of property through deceit (Section 1348(1)); or, (ii) fraudulently "obtain" such property (Section 1348(2)). *See* 18 U.S.C. § 1348. Such fraudulent deprivation and/or obtaining of property is indisputably alleged in the stock purchase in Count 3. The victim on the other side of the transaction surrendered the Company-1 shares Bruce Haghighat purchased fraudulently on the basis of MNPI, as alleged.

The intent element requires a specific "intent to defraud," which is a specific intent to deceive and deprive the victim of property. *See, e.g., United States v. Greenlaw*, 84 F.4th 325, 339–40 (5th Cir. 2023). This can be shown in multiple ways, as the Third Circuit Pattern Jury Instructions demonstrate: "In considering whether [the Defendant] acted with an intent to defraud, you may consider, among other things, whether [the Defendant] acted with a desire or purpose to bring about some gain or benefit to himself **or someone else or** with a desire or purpose to cause some loss to someone." Third Cir. Model Crim. J. Instrs., "Mail or Wire Fraud – 'Intent to Defraud' Defined," § 6.18.1341–4, (Apr. 2024) (emphasis added). Thus, a desire for personal gain is sufficient, but not necessary, to demonstrating an intent to defraud. *See id.* Providing gain to another or property deprivation from a victim both suffice—and both are alleged here. *See id.*; *see also Kousisis*, 145 S. Ct. at 1397.[14]

Second, the Third Circuit has expressly *rejected* the argument that a Defendant must personally profit from a fraud scheme to be liable. In *Porat*, the Third Circuit held "the government need not prove . . . that the scheme was intended to personally benefit [the defendant] . . . ." 76 F.4th at 215.

---

[13] As the Defendant recognizes (Mot. at 22), because Section 1348 was modeled on the other Title 18 fraud statutes, courts similarly construe Section 1348. *See, e.g., United States v. Greenlaw*, 84 F. 4th 325, 339 n.6 (5th Cir. 2023).

[14] The victim need only be deprived of property (*i.e.*, sell shares of Company-1 stock even in exchange for cash), not suffer a net financial loss. *See Kousisis*, 145 S. Ct. at 1397.

There, the defendant was the dean of a business school who was convicted of a scheme to defraud in which he schemed to deprive victims of tuition money by fraudulently inflating the rankings of the school. *Id.* The defendant argued, among other things, that he could not be liable because the government did not prove "that he sought to *personally obtain* money or property from his victims," given that the tuition money went to the school. *Id.* at 221. The court rejected the argument because "[t]he statutory text and the case law do not compel such a reading." *Id.*

The court examined the text of the fraud statute, concluding it "makes no reference to what the defendant receives," and rejected the argument that to obtain means only to bring "into one's own possession." *Id.* (agreeing with the Second Circuit that "the identity of the ultimate beneficiary is not dispositive and the plain meaning of the word 'obtain' is sufficiently capacious to encompass schemes by defendants to obtain money for the benefit of a favored third party" (quoting *United States v. Gatto*, 986 F.3d 104, 124 (2d Cir. 2021)). The court also examined relevant case law and concluded that the Supreme Court "has never suggested that the defendant must seek to personally obtain property" and that the Third Circuit has explained "a defendant need not personally benefit from his fraudulent scheme to be criminally liable." *Id.* (quotations and citations omitted). Accordingly, the Third Circuit rejected the contention that a fraud conviction "requires proof that the defendant sought to personally obtain money or property." *Id.* So should this Court. *See id.*

Third, even if "financial gain" to the Defendant was required by the statute (it is not), it need not "be shown," as the Defendant asserts. (*See* Mot. at 21.) Courts have long established that the success of a fraud scheme is legally irrelevant; the scheme need not even be completed for liability to attach. *See, e.g.*, *Porat*, 76 F.4th at 219 ("[S]uccess of the scheme is not required to sustain a wire fraud conviction." (citing *United States v. Frey*, 42 F.3d 795, 800 (3d Cir. 1994)).

Fourth, even if the Defendant was required to personally profit for primary liability (he is not), that does absolutely nothing to address his liability under 18 U.S.C. § 2, which the Defendant does

21

not challenge and which the Indictment's allegations indisputably satisfy. *See, e.g.*, *United States v. Frorup*, 963 F.2d 41, 43 (3d Cir. 1992) (explaining aiding and abetting requires only "some affirmative participation which at least encourages the principal offender to commit the offense" (cleaned up)).

Accordingly, personal profit is not required for Section 1348 liability and the Court must reject the Defendant's arguments. *See Porat*, 76 F.4th at 215.

### 2. Personal pecuniary profit is not required under Section 10(b).

Similarly, under Section 10(b), there is no requirement that a tippee gain pecuniary profit from trading based on MNPI. All that is required is that the tippee *trade* on the basis of MNPI, knowing it was tipped in breach of the tipper's duty and the *tipper* obtained a personal benefit. *See, e.g.*, *McGee*, 895 F. Supp. 2d at 682–83 (stating elements for tippee liability which, as to a tippee, require only that the tippee (1) trade on MNPI the tippee (2) knows or should know is provided in breach of insider's duty); *see also Dirks*, 463 U.S. at 660–61 ("[A] tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on [MNPI] only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee and the tippee knows or should know that there has been a breach." In such situations, "a tippee is under an obligation to disclose or abstain" from trading.); *SEC v. Obus*, 693 F.3d 276, 287–88 (2d Cir. 2012) ("[T]ippee liability can be established if a tippee knew or had reason to know that confidential information was initially obtained and transmitted improperly (and thus through deception), and if the tippee intentionally or recklessly traded while in knowing possession of that information."). The case law does not impose the same personal benefit requirement on the tippee, unless that tippee becomes an intermediate tipper. The Second Circuit articulated this distinction clearly in *Obus*, writing:

> A tipper will be liable if he tips material non-public information, in breach of a fiduciary duty, to someone he knows will likely (1) trade on the information or (2) disseminate the information further for the first tippee's own benefit. The **first tippee** must know or have reason to know that the information was obtained and transmitted through a breach and intentionally or recklessly tip the information further **for**

> **her own benefit**. The **final tippee** must **both know or have reason
> to know that the information was obtained through a breach and
> trade while in knowing possession of the information**.

*Obus*, 693 F.3d at 288–89 (emphasis added). Thus, only where a tippee becomes a tipper to a

downstream tippee is a personal benefit to the initial tippee required. The final tippee need not benefit.

*See id.*

This accords with the broader case law, because the focus of the personal benefit test is on

the tipper, not the tippee. *See, e.g., Dirks*, at 662–64 ("[T]he test is whether the insider personally will

benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach

of duty to stockholders. And absent a breach by the insider, there is no derivative breach."). Thus, for

a mere tippee, as long as the *tipper* received a personal benefit, illicit trading on the basis of MNPI is

enough.[15] *See Obus*, 693 F.3d at 288–89.

Thus, the key questions under the law with respect to the tippee are:

- Did the tipper breach a fiduciary duty by disclosing MNPI?

- Did the tippee know or should have known of that breach?

- Did the tippee trade on the basis of that MNPI?

The Indictment's allegations answer yes to all of these questions.

Bruce Haghighat acting in his capacity as trustee similarly does not insulate him from liability,

as he can be liable for profits that accrue to the benefit of another. *See, e.g., SEC v. Contorinis*, 743 F.3d

296, 303 (2d Cir. 2014) ("Whether the defendant's motive is direct economic profit, self-

---

[15] Even attempting to trade on the basis of information the tippee believes to be MNPI is enough for
liability, although that belief may be ultimately incorrect. *See, e.g., Tarasi v. Pittsburgh Nat'l Bank*, 555 F.2d 1152,
1161 (3d Cir. 1977) ("There is no dispute regarding the nature of the securities law violations committed by the
plaintiffs," who incorrectly believed they were trading on inside information.); *Kuehnert v. Textar Corp.*, 412 F.2d
700, 704 (5th Cir. 1969) (discussing a tippee who traded on information he thought was MNPI but turned out
to be fictitious: "we are not convinced of any difference in substance between a successful fraud and an attempt.
The statutory phrase 'any manipulative or deceptive device,' . . . seems broad enough to encompass conduct
irrespective of its outcome.").

aggrandizement, psychic satisfaction from benefitting a loved one . . . the insider trader who trades for another's account has engaged in a fraud, secured a benefit thereby, and directed the profits of the fraud where he has chosen them to go."); *SEC v. Warde*, 151 F.3d 42, 29 (2d Cir. 1998) (rejecting defendant's argument the profits from insider trading in trust "were fairly characterized as third party profits" because a "tippee's gains are attributable to the tipper, regardless whether benefit accrues to the tipper"); *SEC v. Shared Med. Sys. Corp.*, 1994 WL 201858 (E.D. Pa. 1994) (explaining, where trading done in account for benefit of defendant's children, trader "acting upon material nonpublic information may be liable for trades he effects for the accounts of others").

Even if a "personal benefit" to the tippee is required, this case presents one of the easiest possible: Bruce Haghighat traded on the basis of MNPI and then gave a literal "cash gift" to his "trading relative." *See Salman*, 580 U.S. at 49. In *Dirks*, the Supreme Court held the personal benefit test is satisfied "when an insider makes a gift of confidential information to a trading relative or friend." 463 U.S. at 664. The Court explained, "[t]he tip and trade resemble trading by the insider followed by a gift of the profits to the recipient." *Id.*

Further, in *United States v. Salman*, the Supreme Court found the personal benefit test satisfied where the tipper gave the MNPI to his brother (intermediate tippee), who then tipped the defendant. 580 U.S. at 48–49. The defendant argued that a "gift of confidential information to a trading relative or friend" is insufficient to satisfy the personal benefit test because the tipper does not benefit "unless the tipper's goal in disclosing inside information is to obtain money, property, or something of tangible value." *Id.* at 46. The Supreme Court rejected that argument, holding that "*Dirks* makes clear that a tipper breaches a fiduciary duty by making a gift of confidential information to 'a trading relative,'" because "the jury can infer that the tipper meant to provide the equivalent of a cash gift." *Id.* at 49. "In such situations, the tipper benefits personally because giving a gift of trading information is the same thing as trading by the tipper followed by a gift of the proceeds." *Id.* at 49–50; *see also United States*

24

*v. Martoma*, 894 F.3d 64, 68 (2d Cir. 2017) ("[T]he tip and trade resemble trading by the insider followed by a gift of the profits to the recipient . . . .").

This case presents not even the "equivalent of a cash gift" implied by the gifting of information, but a literal cash gift of the alleged insider trading profits back to a trust held in his brother's name. *See id.* Thus, to the extent the Court interprets Bruce Haghighat as requiring a benefit for Section 10(b) liability[16] (or construes him as an intermediate tippee to the benefit of the trust, as he suggests), the benefit here is more concrete than the benefits recognized in either *Dirks* or *Salman*. *See id.*; *Dirks*, at 662–64.

Again, even if all that did not suffice, the Defendant does not address his liability in Count 3 under 18 U.S.C. § 2, which the allegations also adequately charge. *See, e.g.*, *Frorup*, 963 F.2d at 43.

### C. The Indictment adequately alleges Bruce Haghighat acted willfully in trading Company-1 securities on the basis of MNPI tipped by Ross Haghighat.

As discussed at length above, the Indictment's allegations are sufficient to allege the Defendant acted willfully in trading on the basis of MNPI. The Indictment expressly alleges Bruce Haghighat "traded Company-1 securities on the basis of that MNPI" tipped by Ross Haghighat and that he did so "knowingly, and with the intent to defraud" as well as "knowingly and willfully." (*Id.* paras. 19, 81, 83.) Those allegations must be taken as true.

Further, the Indictment is replete with allegations from which Bruce Haghighat's willfulness can be inferred, as it often is in insider trading cases. *See, e.g.*, *McGee*, 895 F. Supp. 2d at 683–84 ("In the insider trading context, scienter may be inferred from circumstantial evidence because the specific facts are peculiarly within the knowledge of the defendants."). Such facts include, for example:

---

[16] Caselaw suggests the "personal benefit" test does not apply to Section 1348 insider trading claims. *See Blaszczak*, 947 F.3d at 45. To the extent the test does apply, the allegations satisfy the test for purposes of Section 1348 as well.

- Suspicious timing of the communications with Ross Haghighat (even setting aside the incriminatory content) followed by trading in Company-1 stock.[17]

- The urgency Bruce Haghighat expressed to the financial advisor.

- The fact that Bruce Haghighat was attempting to set up options trading for the first time in the account for his "opportunity transaction."[18]

- Bruce Haghighat's sophistication as a CEO who holds an MBA.[19]

Accepting these and other facts as true, it cannot be said that the Indictment is "so defective that it does not, by any reasonable construction, charge an offense." *See Advantage Med. Transp.*, 751 F. App'x at 262. Accordingly, the Indictment "should be upheld." *See id.*

Nor does it matter that the Defendant was acting in his role as trustee. Where he knew what he was doing was wrong, as alleged, he incurs liability. *See, e.g.*, *Warde*, 151 F.3d at 29. The Indictment alleges as much. A jury should decide what is so.

## Conclusion

The Court should deny the Motion because the Indictment is not internally inconsistent and adequately alleges facts that satisfy the elements of the charged offenses.

---

[17] *See, e.g.*, *SEC v. Ginsburg*, 362 F.3d 1292, 1299 (11th Cir. 2004) ("The temporal proximity of a phone conversation between the trader and one with insider knowledge provides a reasonable basis for inferring that the basis of the trader's belief was the inside information."); *SEC v. Steffes*, 805 F. Supp. 2d 601, 618 (N.D. Ill. 2011) (holding "suspicious timing" of phone conversations between the insider and the defendant supported an inference of scienter); *United States v. Rajaratnam*, 802 F. Supp. 2d 491, 504–05 (S.D.N.Y. 2011) ("[B]oth the Second and Ninth Circuits have noted that evidence of timely trading following calls connecting an insider and tippees, particularly in 'situations in which unique trading patterns . . . suggest that an investor had used inside information,' gives rise to a strong inference of insider trading." (citations omitted)).

[18] *See e.g.*, *SEC v. Musella*, 748 F. Supp. 1028, 1039 (S.D.N.Y. 1989) (finding it "suggestive of insider trading where it was defendants 'first options purchase in over three years'" among other factors).

[19] *See, e.g.*, *SEC v. Carroll*, No. 11–165, 2011 WL 5880875, at *8 (W.D. Ky. Nov. 23, 2011) ("A tippee's sophistication supports an inference of knowledge that information was obtained in violation of the tipper's fiduciary duty.").

Dated: August 29, 2025     Respectfully submitted,

             LORINDA I. LARYEA
             Acting Chief
             Fraud Section, Criminal Division
             U.S. Department of Justice

By:   */s/ John J. Liolos*
             John J. Liolos, Trial Attorney
             Fraud Section, Criminal Division
             United States Department of Justice
             1400 New York Avenue, NW
             Washington, DC 20005
             John.Liolos@usdoj.gov
             (202) 768-2246

**<u>Certificate of Service</u>**

I hereby certify that, on August 29, 2025, a true and correct copy of the foregoing was served on all parties through the CM/ECF system.

By:       <u>/s/ John J. Liolos</u>

John J. Liolos, Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, DC 20005
John.Liolos@usdoj.gov
(202) 768-2246